UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| 3M COMPANY, a Delaware corporation; 3M EMPLOYEES WELFARE BENEFITS ASSOCIATION, a Minnesota corporation; EMPLOYEE RETIREMENT INCOME PLAN OF MINNESOTA MINING AND MANUFACTURING COMPANY, a citizen of New York, | Case No. 14-CV-1058 (PJS/JSM) |
| Plaintiffs, | |
| v. | ORDER |
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, a Pennsylvania corporation; GREAT AMERICAN INSURANCE COMPANY, an Ohio corporation; ST. PAUL FIRE & MARINE INSURANCE COMPANY, a Connecticut corporation; FEDERAL INSURANCE COMPANY, a New Jersey corporation; ZURICH AMERICAN INSURANCE COMPANY, a New York corporation, | |
| Defendants. | |

---

James R. Murray, Jared Zola, and Omid Safa, DICKSTEIN SHAPIRO LLP; Thomas A. Boardman, Thomas C. Mielenhausen, and Christopher H. Yetka, BARNES & THORNBURG LLP; Ann Marie Hanrahan, 3M COMPANY, for plaintiffs.

David P. Pearson, Brent A. Lorentz, and Reid J. Golden, WINTHROP & WEINSTINE, P.A., for defendant National Union Fire Insurance Company of Pittsburgh, Pa.

Richard M. Hagstrom and Nicholas A. Dolejsi, ZELLE HOFMANN
VOELBEL & MASON LLP; Stephen N. Dratch and Martin L. Fenik,
FRANZBLAU DRATCH, P.C., for defendant Great American Insurance
Company.

Joel T. Wiegert, MEAGHER & GEER, PLLP; Arthur N. Lambert and
M. Diane Duszak, FRENKEL LAMBERT WEISS WEISMAN & GORDON,
LLP, for St. Paul Fire & Marine Insurance Company.

Eric J. Magnuson and Richard B. Allyn, ROBINS KAPLAN MILLER &
CIRESI LLP; Jeanne H. Unger, BASSFORD REMELE, for Federal
Insurance Company.

Peter G. Van Bergen and Andrea E. Reisbord, COUSINEAU MCGUIRE
CHARTERED, for defendant Zurich American Insurance Company.

Plaintiffs 3M Company, 3M Employee Welfare Benefits Association, and

Employee Retirement Income Plan of Minnesota Mining and Manufacturing Company

(collectively "3M") bring this action against their insurers seeking coverage for the loss

of the returns that 3M says it earned on certain of its investments but lost through the

fraud of its investment advisors.[1]

---

[1]3M originally brought this action in state court.  Defendants removed the action
under 28 U.S.C. § 1352, which confers federal jurisdiction over "any action on a bond
executed under any law of the United States . . . ."  *See Ohio Sav. Bank v. Progressive Cas.
Ins. Co.*, 521 F.3d 960, 962 n.2 (8th Cir. 2008).  Under the Employee Retirement Income
Security Act ("ERISA"), 29 U.S.C. §§ 1001 et seq., 3M is required to maintain bond
coverage for fiduciaries and officials of its ERISA plans, 29 U.S.C. § 1112, which means
that this Court has jurisdiction under § 1352.

Commentators have suggested that cases over which there is § 1352 jurisdiction
arise under federal law.  13D Charles Alan Wright et al., *Federal Practice and Procedure*
§ 3572 (3d ed. 2008) ("It has long been clear that a suit on a bond executed under federal
(continued...)

This matter is before the Court on the insurers' motion for summary judgment and 3M's cross-motion for partial summary judgment. For the reasons that follow, the Court grants the insurers' motion and denies 3M's. Specifically, the Court holds that there is no coverage for 3M's alleged losses because 3M does not meet the conditions of coverage set forth in the "ownership" provision of the primary insurance policy.

## I. BACKGROUND

### A. 3M's Investment and Losses

In 1999, 3M began investing its employee-benefit plan assets in WG Trading Company LP ("WG Trading"). 3M's investment was structured as a limited partnership in WG Trading. Stephen Walsh and Paul Greenwood were the founders and general managing partners of WG Trading as well as of two related entities: Westridge Capital Management, Inc. ("Westridge") and WG Trading Investors, LP ("WG Investors"). Westridge was the marketing vehicle for WG Trading. Murray Decl. Ex. 1 at 4. WG Investors was a limited partner in WG Trading. Murray Decl. Ex. 1 at 3. WG Trading was a regulated and audited entity; WG Investors was neither regulated nor audited. Murray Decl. Ex. 1 at 3-4.

---

[1](...continued)
law arises under federal law and thus invokes jurisdiction under the general federal-question statute."). The parties have treated Minnesota law as controlling, however, and the Court therefore follows suit. *Cf. Ohio Sav. Bank*, 521 F.3d at 962 (following the parties' lead in applying state law in a § 1352 case).

Walsh and Greenwood were, in fact, operating a huge Ponzi scheme, and over many years Walsh and Greenwood fraudulently diverted hundreds of millions of dollars from WG Trading and WG Investors for their personal use and to conceal their fraud.  As described by the Second Circuit:

> For more than 13 years, beginning prior to 1996, [Walsh and Greenwood] conducted their business—which offered various investment vehicles for pursuing an index arbitrage strategy—as a Ponzi scheme.  Defendants issued fraudulent account statements to their investors, withdrew invested moneys in order to spend lavishly on themselves, and funded investor withdrawals with moneys received from other investors when there were no earnings.

*Commodity Futures Trading Comm'n v. Walsh*, 712 F.3d 735, 738-39 (2d Cir. 2013).  Walsh and Greenwood ultimately pleaded guilty to federal criminal charges.  Murray Decl. Ex. 1 at 2, 9.

In February 2009, the U.S. Commodity Futures Trading Commission ("CFTC") and the U.S. Securities and Exchange Commission ("SEC") initiated civil lawsuits against Walsh, Greenwood, Westridge, WG Trading, WG Investors, and other related entities and individuals.  *See Walsh*, 712 F.3d 735.  The United States District Court for the Southern District of New York froze the defendants' assets and placed them into receivership.  Murray Decl. Ex. 11 ¶¶ 15, 22.  The court appointed Robb Evans & Associates, LLC as the receiver.  Murray Decl. Ex. 11 ¶ 22.

The receiver was responsible for investigating and recovering receivership assets and recommending a plan for distributing those assets among the defrauded claimants. Murray Decl. Ex. 11 ¶ 23; Pearson Decl., Nov. 21, 2014 [hereinafter "Pearson Decl."] Ex. 6; *Walsh*, 712 F.3d at 742.  The receiver had considerable success.  As a result of the receivership proceeding, 3M was able to recover every penny of the capital contributions that it had invested in WG Trading (and had not already withdrawn). Pearson Decl. Ex. 35 at 9.  3M argues, however, that it nevertheless suffered a loss because, it says, at least some of its capital was invested by WG Trading in legitimate vehicles and produced legitimate earnings, and 3M was never paid those legitimate earnings.  3M further argues that, with the help of forensic accountants, it can "untangle" the massive Ponzi scheme operated by Walsh and Greenwood and quantify the amount of legitimate earnings that it lost on account of their fraud.

Every neutral observer who has been involved in this matter—including the receiver, the CFTC, the SEC, the United States District Court for the Southern District of New York, and the Second Circuit—appears to believe that what 3M proposes to do is impossible.  In the words of the Second Circuit:

> The Receiver observed that WGTC [i.e., WG Trading] and WGTI [i.e., WG Investors] had "a long history" of not only commingling funds, but also "employing fraudulent accounting practices in an apparent attempt to conceal the true financial condition of the entities from," among others, their investors.  Thus, WGTC received money from WGTI's

investors; WGTI received money from WGTC's investors; WGTC made payments to or for WGTI's investors; WGTI made payments to WGTC's investors.  At the behest of WGTI, WGTC made employee advances to Greenwood and Walsh and charged WGTI's capital account.  When WGTC lost $121 million by financing and investing in Signal Apparel Company, WGTC charged those losses against the capital account of WGTI.  And "when WGTC was short of funds, WGTI advanced the funds to WGTC"; "neither entity could have survived without the financial support of investor funds raised by the other."  "WGTC allocated actual yearly earnings to its limited partners based on an *arbitrary* earnings rate and then allocated the remaining income or loss to WGTI."  *Given the long history of commingling, defendants' operation of WGTC and WGTI as if they were a single entity, and defendants' employment of fraudulent accounting practices, the record supported the view of the CFTC and the SEC that the assets of WGTC and WGTI could not be reliably unraveled.*  Acceptance of the 3M Group's argument that the court should grant its requested premium on the theory that the financial records found by the Receiver were accurate would . . . let "the whim of the defrauder . . . control[ ] the process that is supposed to unwind the fraud."

*Walsh*, 712 F.3d at 753-54 (citations omitted; second emphasis added).

For present purposes, however, the Court will assume that 3M can "reliably unravel[]" the Ponzi scheme and quantify some amount of legitimate returns that were earned on 3M's investments but not paid to 3M because of the fraud of Walsh and Greenwood.  The question before the Court is whether, assuming that such losses can be established, those losses are covered under the policies issued by the insurers.

*B.  The Policy*

3M is insured under a "Blanket Crime Policy" (the "Policy") issued by defendant National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union").  *See* Pearson Decl. Ex. 1 [hereinafter "Policy"].  Under Endorsement 3 to the Policy (the "ERISA Rider"), 3M's employee-benefit plans are included as insureds.

The Policy is the primary policy under which 3M seeks coverage for its lost earnings.  The remaining insurers' excess policies follow form to the Policy.  Accordingly, only the terms of the Policy are at issue in the parties' motions.

II.  ANALYSIS

*A.  Standard of Review*

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor."  *Id.* at 255.

*B.  3M's Coverage Claim*

3M seeks coverage under the "Employee Dishonesty" insuring agreement,

which, as amended by Endorsement 10, reads as follows:

> The Company shall be liable for direct losses of Money,
> Securities or other property caused by Theft or forgery by
> any Employee of any Insured acting alone or in collusion
> with others.

Policy End. 10 § 1.

The insurers argue that 3M is not entitled to coverage under this provision

because (1) 3M is collaterally estopped from contending that its investment generated

legitimate returns that can be quantified and attributed to 3M, and therefore 3M cannot

prove that it suffered a "direct loss[]"; (2) even if 3M suffered a "direct loss[]" as a result

of legitimate earnings on investments being stolen, 3M did not *own* those earnings at the

time that they were stolen, which is a condition of coverage; and (3) neither Walsh nor

Greenwood were employees of 3M, which is also a condition of coverage.  Because the

Court agrees with the insurers' argument concerning the ownership provision, it need

not address the parties' remaining arguments.

1.  Ownership Provision

Endorsement 8 of the Policy provides, in relevant part, as follows:[2]

---

[2]Endorsement 8 replaces § 5 of the "Conditions and Limitations" section of the
Policy.  Although the relevant language in § 5 differs slightly from the relevant

(continued...)

> The insured property may be owned by the Insured, or held
> by the Insured in any capacity whether or not the Insured is
> legally liable, or may be property as respects which the
> Insured is legally liable.

The insurers contend that the "Employee Dishonesty" insuring agreement is explicitly

made subject to this provision.  The insurers further contend that, as a result, there is no

coverage under the "Employee Dishonesty" insuring agreement unless the "Money,

Securities or other property" to which the clause refers: (1) is owned by the insured;

(2) is held by the insured in any capacity, even if the insured would not be liable for its

loss; or (3) is property with respect to which the insured is legally liable.[3]  The insurers

---

[2](...continued)
language in Endorsement 8, it does not appear that any substantive change was
intended.  Rather, the point of Endorsement 8 appears to be to add a limited form of
liability coverage for the loss of property owned or held by clients of 3M.  That liability
coverage is not at issue here.

[3]The last condition refers to legal liability that predates the loss; it does not refer
to third-party property for which the insured only bears vicarious liability because, for
example, one of its employees negligently damaged the third-party property.  *Cargill,
Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, No. A03-187, 2004 WL 51671, at *13
(Minn. Ct. App. Jan. 13, 2004) ("The language providing coverage for a loss 'for
which . . . the insured is liable' does not change the policy's status as a fidelity bond.");
*Lynch Props., Inc. v. Potomac Ins. Co. of Ill.*, 140 F.3d 622, 629 & n.3 (5th Cir. 1998) ("the
words 'legally liable' refer to the property interest that Lynch Properties must have to
trigger coverage under the employee dishonesty policy" and "do[] not transform the
policy into a liability policy"); *Foster v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 902 F.2d
1316, 1318 (8th Cir. 1990) ("A fidelity bond is not ordinarily liability insurance which
covers third parties."), *abrogated on other grounds by Salve Regina Coll. v. Russell*, 499 U.S.
225 (1991); *Mass. Mut. Life Ins. Co. v. Certain Underwriters at Lloyd's of London*, No. 4791-
VCL, 2010 WL 2929552, at *20 (Del. Ch. July 23, 2010) ("The phrase . . . extends coverage
(continued...)

argue that even if 3M's investment with WG Trading generated legitimate earnings that can be quantified and attributed to 3M, those legitimate earnings are not covered because, at the time that they were stolen, they were not (1) owned by 3M; (2) held by 3M in any capacity, even if 3M would not be liable for their loss; or (3) property with respect to which 3M was legally liable.

3M disagrees.  3M concedes that the "Employee Dishonesty" insuring agreement is subject to the ownership provision in Endorsement 8—in the same general way that, for example, every provision of an insurance policy is subject to the definitions section or notice provisions of that policy.  But 3M argues that the ownership provision in Endorsement 8 is simply irrelevant to its claim for coverage under the "Employee Dishonesty" insuring agreement because the ownership provision only applies to "*insured* property," and the "Employee Dishonesty" insuring agreement does not use the term "*insured* property" or limit its coverage to such property.  Instead, 3M argues, the "Employee Dishonesty" insuring agreement covers "direct losses of Money, Securities or other *property* caused by Theft or forgery."  Similarly, the "Employee

---

[3](...continued)
to property which, prior to its misappropriation, was the legal responsibility of the Assureds."); *Aetna Cas. & Sur. Co. v. Kidder, Peabody & Co.*, 246 A.D.2d 202, 212 (N.Y. App. Div. 1998) ("Insurance covers the liability of the insureds to a third party, while fidelity bonding covers the loss of property owned by the insureds or held by the insureds, as a consequence of employee dishonesty."); *see also* Policy Exclusion (m) (excluding coverage for "damages of any type for which the Insured is legally liable, except direct compensatory damages arising from a loss covered under this Policy").

Dishonesty" insuring agreement defines "Theft" to mean "the unlawful taking of
Money, Securities or other property"—again without referring to "insured property."
Because the "Employee Dishonesty" insuring agreement is not limited to
"insured property," 3M argues, the ownership provision's discussion of "insured
property" is simply irrelevant—in the same way that, say, the Policy's definition of the
term "Messenger" is irrelevant to the "Employee Dishonesty" insuring agreement
because that insuring agreement does not use the term "Messenger."

The problem with 3M's argument is that it treats the ownership provision in
Endorsement 8 as though it *defined* the term "insured property." It plainly does not.
When the Policy seeks to define terms, it does so with explicit definitional language
("The following terms, as used in this Policy, shall have the respective meanings stated
in this Section") and it does so in § 3 of the Policy (which is labeled "DEFINITIONS").
And when Endorsement 8 seeks to define a term, it does so by explicitly amending § 3
of the Policy. Policy End. 8 § 4.

Clearly, then, Endorsement 8 is not intended to *define* "insured property,"as 3M's
argument implies. Instead, Endorsement 8 simply uses the term "insured property" to
limit the coverage afforded under the "Employee Dishonesty" insuring agreement.
And giving that phrase its plain and ordinary meaning, *see Mattson Ridge, LLC v. Clear
Rock Title, LLP*, 824 N.W.2d 622, 632 (Minn. 2012), the phrase "insured property" can

only be understood as a shorthand way of saying "property whose loss is insured under this Policy"—that is, property that is insured under at least one of the insuring agreements in the Policy, such as the "Employee Dishonesty" insuring agreement.

Indeed, because "insured property" is not a defined term, the Court is at a loss to know what else it *could* mean.  If it does not refer to property whose loss is insured under one or more of the various insuring agreements, then the Policy itself becomes nonsensical.  Notably, although the phrase "insured property" appears in the original version of § 5 of the "Conditions and Limitations" section of the Policy (as well as in several other places in the Policy), the phrase does not appear in *any* of the original versions of the insuring agreements.  This means that, if 3M's interpretation were correct, then § 5 in the original version of the Policy—a provision that was clearly intended to limit the coverage available under the insuring agreements—would not have applied to a single one of those insuring agreements.  That cannot be what the drafters intended, nor is that reading compelled by the language of the Policy.

3M points out that the phrase "insured property" appears in other contexts in the Policy, including in the insuring agreement that appears in Endorsement 7, which is labeled "Computer & Funds Transfer Fraud Coverage."  That endorsement provides coverage for "[t]he theft of any Insured property by Computer Fraud," and "theft" is defined to be "the intentional and unlawful taking of insured property to the

deprivation of the Insured."  3M argues that this usage demonstrates that when the Policy intends for the ownership provision of Endorsement 8 to apply, it uses the precise phrase "insured property," and when the Policy does not intend the ownership provision of Endorsement 8 to apply, it uses the word "property" or some other phrase.

The Court is not persuaded that these uses of the phrase indicate that "insured property" means something other than "property that is insured under an insuring agreement in the Policy."  Again, because "insured property" is not defined in the Policy, Endorsement 7 would make no sense unless it refers to the property described more particularly in various other insuring agreements in the Policy.  When read this way, Endorsement 7 ensures that the types of property whose loss is *already* insured under the Policy are *also* insured when that loss is caused through computer or electronic fraud.  This reading is the only reasonable one in light of the fact that "insured property" is not a term of art in the context of the Policy.

3M also points to the permissive language of Endorsement 8, noting that Endorsement 8 merely says that the insured property "may" be owned or held by the insured, not that it "must" or "shall" be.  While Endorsement 8 could be clearer, the Court does not believe that it is reasonable to interpret Endorsement 8 as simply reciting a list of some (but not all) of the ways in which the property may (or may not) be held.  Read in such a way, Endorsement 8 would have no purpose; it would amount

to little more than meaningless verbiage.  3M contends that Endorsement 8 is intended to broaden coverage to property other than that strictly owned by the insured.  If that were its purpose, however, Endorsement 8 would accomplish nothing, as nothing in the insuring agreements *requires* the insured to own the lost property.  A more reasonable reading of Endorsement 8—a reading that also gives it a purpose—is that Endorsement 8 establishes three different conditions, any one of which the property *may* meet, but at least one of which the property *must* meet.  *See Eng'g & Constr. Innovations, Inc. v. L.H. Bolduc Co.*, 825 N.W.2d 695, 705 (Minn. 2013) (if possible, courts construe insurance contracts to give effect to all of their provisions).

Finally, 3M relies heavily on *Transtar Electric, Inc. v. Charter Oak Fire Insurance Co.*, No. 13-1837, 2014 WL 252023 (N.D. Ohio Jan. 22, 2014) (*Transtar I*), for the proposition that coverage under the "Employee Dishonesty" insuring agreement is not limited to property in which 3M has some kind of interest.  In *Transtar I*, the court accepted the insured's argument that a third party's loss, for which the insured contended that it was liable in tort, was a "direct" loss to the insured that was covered under the policy.  *Id.* at *3-4.  *Transtar I* did not examine an ownership provision like that at issue here, however.[4]  More importantly, the *Transtar* court later reversed course and held that the

---

[4]3M asserts that the policy at issue in *Transtar I* had an ownership provision. Given the court's failure even to mention it, however, *Transtar I* is not persuasive authority on the applicability or meaning of that (unmentioned) provision.

loss was only an "indirect" loss excluded from coverage.[5]  *Transtar Elec., Inc. v. Charter Oak Fire Ins. Co.*, No. 13-1837, 2015 WL 1524069, at *3 (N.D Ohio Apr. 3, 2015) (*Transtar II*).  Like *Transtar I*, *Transtar II* did not cite or discuss any ownership provision.  Thus, to the extent that *Transtar I* or *II* is even relevant, it does not help 3M.

The Court therefore concludes that Endorsement 8 limits the coverage available under the "Employee Dishonesty" provision to the three types of property that it describes.

2.  Whether 3M "Owned" the Lost Earnings

The next question, then, is whether the lost earnings for which 3M seeks indemnification qualify as one of the three types of property described in Endorsement 8.  Again, under Endorsement 8, the property must meet one of the following conditions:  (1) it is owned by the insured; (2) it is held by the insured in any capacity, even if the insured would not be liable for its loss; or (3) it is property with respect to which the insured is legally liable.

---

[5]Notably, a similar exclusion appears in the Policy at issue in this case.  *See* Policy Exclusion (m) (excluding coverage for "damages of any type for which the Insured is legally liable, except direct compensatory damages arising from a loss covered under this Policy").

3M contends that it "owned" the lost earnings.[6]  The Court agrees with National

Union, however, that what 3M owned was a limited-partnership interest in

WG Trading.  Up until the point at which earnings were distributed to the partners, the

earnings of WG Trading were owned by WG Trading, and not by 3M or any of the

other limited partners.

    As noted, 3M's investment was structured as a limited-partnership interest in

WG Trading.  WG Trading's partnership agreements are governed by Delaware law.

Pearson Decl. Ex. 24, Fourth Am. Ltd. P'shp Agmt. § 18.6; Fifth Am. Ltd. P'ship Agmt.

§ 18.7.  Delaware law is crystal clear that a limited partner such as 3M has "no interest

in specific limited partnership property."  Del. Code Ann. tit. 6, § 17-701; *In re Bernard L.*

*Madoff Inv. Secs. LLC*, 708 F.3d 422, 427 (2d Cir. 2013) (under Delaware law, "the limited

partnership interests sold by the Feeder Funds to investors . . . did not confer an

ownership interest in money that the Feeder Funds ultimately invested in BLMIS"); *In*

*re Marriott Hotel Props. II Ltd. P'ship*, No. CIV.A.14961, 2000 WL 128875, at *15 (Del. Ch.

---

[6]3M also argues that it had fiduciary duties with respect to the lost earnings and that therefore those earnings are "property as respects which the Insured is legally liable."  Policy End. 8.  3M raised this argument for the first time in its reply brief, however, and therefore the Court will not consider it.  *See Torspo Hockey Int'l, Inc. v. Kor Hockey Ltd.*, 491 F.Supp.2d 871, 878 (D . Minn. 2007) ("federal courts do not, as a rule, entertain arguments made by a party for the first time in a reply brief"); *see also Smith v. United States*, 256 F. App'x 850, 852 (8th Cir. 2007) ("the district court did not err in dismissing claims raised for the first time in a . . . reply brief"); *Navarijo-Barrios v. Ashcroft*, 322 F.3d 561, 564 (8th Cir. 2003) ("It is well settled that we do not consider arguments raised for the first time in a reply brief.").

Jan. 24, 2000) (Section 17-701 "has been interpreted to preclude the attempt to equate

ownership interests in a partnership with ownership of partnership property.").  The

partner's right to receive distributions of the partnership's assets does not change this

fact.  *See SEC v. Aragon Capital Advisors, LLC*, No. 07-0919, 2011 WL 3278907, at *19

(S.D.N.Y. July 26, 2011) ("The right to receive distributions . . . is distinct from having an

ownership interest in those assets of the partnership.").  Moreover, there is no reason

why the common practice of maintaining separate capital accounts for each partner

should change the default rule, and 3M cites no cases or other authority suggesting that

it does.  *See* Karen T. Lohnes et al., *Value Equals Basis and Partners' Distributive Share:*

*Stuffing, Fill-Ups, and Waterfalls*, 105 J. of Tax'n 109, 110 (2006) ("It is typical for

partnerships . . . to maintain Section 704(b) book capital accounts in accordance with the

rules of Reg. 1.704-1(b)(2)(iv)."); Pearson Decl. Ex. 24 § 8.1 ("[t]he Partnership shall

establish and maintain an account (a 'Capital Account') for each Partner in accordance

with regulation 1.704-1(b)" of the Internal Revenue Code).

3M cites a dictionary definition of "own," arguing that ownership encompasses

the right to possess a thing, regardless of actual or constructive control.  *See Black's Law*

*Dictionary* 1138 (8th ed. 2004).  Delaware law is clear, however, that even though 3M

had a general right to receive distributions from the partnership, 3M did not own any

specific earnings or any other "specific limited partnership property."  Del. Code Ann.

tit. 6, § 17-701; *see Aragon Capital Advisors, LLC*, 2011 Wl 3278907, at *19.  3M cites no

authority for the proposition that, *before* the earnings were distributed, 3M had the right

to possess those earnings or exercise any of the other traditional attributes of ownership

over those earnings.

3M also cites *Sears Roebuck & Co. v. National Union Fire Insurance Co. of Pittsburgh,*

*Pa.*, No. B187280, 2007 WL 2876149 (Cal. Ct. App. Oct. 4, 2007) for the proposition that

courts interpret the "ownership" provision broadly.  But *Sears Roebuck* looked to state

law to determine whether the insured had an ownership interest in the stolen funds, *id.*

at *4-6, precisely as the Court is doing in this case.  *Sears Roebuck* confirms that "owned"

is normally understood to mean an ownership interest recognized by state law.

3M next points to regulations promulgated under ERISA that define an ERISA

plan's assets in the context of a plan's investment in another entity.  *See* 29 C.F.R.

§ 2510.3-101.  With respect to an investment in a limited partnership, the regulations

provide that an ERISA plan's assets include both the equity interest in the partnership

itself and an interest in the underlying assets owned by the partnership (with certain

exceptions that neither party has contended are relevant).  29 C.F.R. § 2510.3-101(a)(2),

(j)(2).

The purpose of these regulations, however, is not to alter property rights, which

are traditionally governed by state law, but rather to ensure that ERISA imposes

fiduciary duties broadly on anyone who, in functional terms, handles any property

"which is used *or may be used* as a source for the payment of benefits to plan

participants." 29 C.F.R. § 2580.412-4 (emphasis added). As the Department of Labor

explained when it promulgated the regulation defining "plan assets":

> The proposed plan assets regulation described the
> circumstances under which the assets of an entity in which a
> plan invests will be considered to include "plan assets" so
> that the manager of the entity would be subject to the
> fiduciary responsibility rules of ERISA. . . .
>
> In the Department's view, it would be unreasonable to
> suppose that Congress intended that the protections of the
> fiduciary responsibility provisions of the Act which are
> applicable where a plan directly retains a manager of its
> investments would not be applicable where the manager is
> retained indirectly through investment by the plan in a
> collective investment fund. It would also appear to be
> inconsistent with the broad functional definition of
> "fiduciary" in ERISA if persons who provide services that
> would cause them to be fiduciaries if the services were
> provided directly to plans are able to circumvent the
> fiduciary responsibility rules of the Act by the interposition
> of a separate legal entity between themselves and the plans
> (for example, by providing services to a limited partnership
> in which plans invest).

Final Regulation Relating to the Definition of Plan Assets, 51 Fed. Reg. 41262, 41262-63

(Nov. 13, 1986). In other words, the purpose of the regulation is to ensure that *fiduciary*

*responsibilities* are spread broadly; it is not an attempt to redefine *property rights*

established under state law. *See Sec. Inv'r Prot. Corp. v. Jacqueline Green Rollover Account*,

No. 12-1039, 2012 WL 3042986, at *8 (S.D.N.Y. July 25, 2012) ("Even if the Plan

Claimants are correct that the Account-Holder Entities' assets qualify as 'plan assets,'

this does not by itself confer upon the Plan Claimants an ownership interest in the

assets in question.").

Setting that aside, the question in this case is not whether the lost earnings are

deemed to be plan assets under ERISA regulations.  Instead, the question is one of

contract interpretation:  Should the phrase "owned by the Insured" in Endorsement 8 be

construed to refer to a traditional notion of property rights, as governed by state law?

Or should it, as 3M argues, be construed to encompass anything defined as a "plan

asset" under an ERISA regulation, given that the purpose of Endorsement 3 (the ERISA

rider to the Policy) is to comply with ERISA's bonding requirement?

Having carefully considered the issue, the Court concludes that "owned by the

Insured" should be interpreted in the traditional, state-law sense, for several reasons.

First, because the Policy does not define "owned," that word must be given its plain

and ordinary meaning.  *See Mattson Ridge, LLC*, 824 N.W.2d at 632.  The plain and

ordinary meaning of "owned" does not resemble ERISA's expansive concept of "plan

assets," which has nothing to do with defining ownership or property rights, and which

departs dramatically from the usual meaning of the word.

Second, when the parties to the Policy intended a word to have a more expansive meaning in order to comply with ERISA, they explicitly broadened the definition. For example, Endorsement 21 to the Policy expands the definition of "employee" to include "any one or more natural persons while in the service of any Employee Benefit plan . . . as fiduciary, trustee, administrator, officer or employee and any other natural person required to be bonded" under ERISA. Policy End. 21 ¶ 2. Just as the parties explicitly expanded the definition of "employee" far beyond its common meaning, the parties could have explicitly expanded the definition of "owned" far beyond its common meaning to mirror the far-reaching definition of "plan assets" found in the ERISA regulations. That the parties did not do so indicates that they intended to invoke the ordinary meaning of the term.

Finally, it is worth noting that the "plan assets" regulation was originally promulgated in 1986. Despite the fact that the regulation has existed for almost 30 years, and despite the fact that the ownership provision found in Endorsement 8 is a standard part of form fidelity bonds,[7] 3M has been unable to cite—and the Court has been unable to find—a single case interpreting the ownership provision to conform to the ERISA regulation's expansive notion of "plan assets." Given the lack of authority

_____

[7]*See* Scott L. Schmookler, *The Compensibility of Third-Party Losses Under Fidelity Bonds*, 7 Fidelity L.J. 115, 115 (2001) (referring to "the ownership provision in standard form fidelity bonds").

for such an unusual reading—and given the existence of authority indicating that

"owned" refers to ownership rights under state law, *see Sears Roebuck & Co.*, 2007 WL

2876149, at *4-6—the Court concludes that the ordinary, state-law meaning of "owned"

should control.

3M nevertheless argues that the Policy should be interpreted to provide coverage

because (1) Endorsement 3, the ERISA rider, explicitly states that it is intended to

comply with ERISA's bonding requirements and (2) Greenwood and Walsh were

required to be bonded under ERISA.

Even assuming that Walsh and Greenwood were required to be bonded under

ERISA—an assumption that may not be true[8]—the Court is not persuaded that a

statement in an ERISA rider to the effect that the rider is intended to comply with

ERISA's bonding requirements justifies departing drastically from the plain meaning of

terms that do not even appear in the rider.  The ERISA rider merely adds 3M's ERISA

---

[8]Under 29 U.S.C. § 1112(a)(2), no bond is required for any entity that (1) "is registered as a broker or a dealer under section 78o(b) of Title 15" and (2) "is subject to the fidelity bond requirements of a self-regulatory organization (within the meaning of section 78c(a)(26) of Title 15)."  The insurers contend that, under this provision, WG Trading was exempt from ERISA's bonding requirements.  Morever, the insurers contend that Greenwood and Walsh were likewise exempt because they were officers or employees of WG Trading.  *See* U.S. Dep't of Labor, Field Assistance Bulletin No. 2008-04 (Nov. 25, 2008), 2008 WL 5459779, at *5 ("As with section 412's other statutory and regulatory exemptions, this exemption for brokers and dealers applies to both the broker-dealer entity and its officers, directors and employees.").  The Court does not rely on this ground, however, because the insurers did not cite admissible evidence establishing that WG Trading was exempt under § 1112(a)(2).

plans as insureds and, along with another endorsement, expands the definition of "employee" in order to comply with ERISA.  The rider does *not* expand the meaning of "owned," however.  And critically, the rider states that "[n]othing herein shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the bond or policy, other than as stated herein."  Policy End. 3 ¶ 7.  It would be inconsistent with this limitation to use the ERISA rider as a reason to give a broad and unusual meaning to "owned" when the ERISA rider says nothing about it.

The Court concludes that, because any lost earnings were not "owned" by 3M within the meaning of the Policy, the insurers are not obligated to indemnify 3M. Accordingly, the insurers' motion for summary judgment on the ownership issue is granted, and 3M's cross-motion on that issue is denied.  In all other respects, the parties' motions are denied as moot.

## ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1.     Defendants' motion for summary judgment [ECF No. 45] is GRANTED as to the ownership issue and DENIED AS MOOT in all other respects.

2.     Plaintiffs' motion for partial summary judgment [ECF No. 54] is DENIED as to the ownership issue and DENIED AS MOOT in all other respects.

3.      Plaintiffs' complaint [ECF No. 1-1] is DISMISSED WITH PREJUDICE

AND ON THE MERITS.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  September 28, 2015               s/Patrick J. Schiltz
                                        Patrick J. Schiltz
                                        United States District Judge